**FLAGSTAFF MEDICAL CENTER, INC., Plaintiff,**

v.

**Louis W. SULLIVAN, Secretary, Department of Health and Human Services, Defendant.**

**Elizabeth MAZON, Leon Salazar, Jack Sabo, Maria Sandoval, Ruth Havatone, Quade Uqualla, and Aurora Petty, individually and on behalf of all other persons similarly situated, Plaintiffs–Appellees,**

v.

**FLAGSTAFF HEALTH MANAGEMENT CORPORATION; Flagstaff Medical Center, Inc.; Louis W. Sullivan, Secretary, Department of Health and Human Services, Defendants–Appellants.**

Nos. 91–16583, 91–16624.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1992.

Decided April 20, 1992.

As amended June 2, 1992.

John P. Schnitker, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant Secretary of the Dept. of Health and Human Services.

John P. Frank and Barbara A. Anstey, Lewis and Roca, Phoenix, Ariz., Kathleen O'Brien, Magnum, Wall, Stoops & Warden, Flagstaff, Ariz., for defendants-appellants Flagstaff Health Management Corp. and Flagstaff Medical Center, Inc.

Michele Melden, Nat. Health Law Program, Los Angeles, Cal., Susan Slasor, Coconino County Legal Aid, Flagstaff, Ariz., for plaintiff-appellee class.

Ronald N. Sutter, Powers, Pyles & Sutter, Washington, D.C.; Jeffrey M. Teske, American Hosp. Ass'n, Chicago, Ill., for amicus American Hosp. Ass'n.

Leslie E. Wallis, Tuttle & Taylor, Los Angeles, Cal., for amici Families, U.S.A. and Arizona Citizen Action.

Before: GOODWIN, FARRIS, and POOLE, Circuit Judges.

FARRIS, Circuit Judge:

This appeal requires us to answer important and pressing questions affecting the provision of free medical care to indigent people under the Hill–Burton Act. Flagstaff and the Secretary argue that this case is moot, that the district court erred in striking down the Secretary's 1988 regulation, and that the district court's remedies are inconsistent with the Act and underlying regulations. Flagstaff makes the additional argument that the plaintiff class' pendent contract claim is preempted. We affirm in part and reverse in part.

I

In 1946, Congress enacted the Hospital Survey and Construction Act, better known as the Hill–Burton Act. Pub.L. No. 79–725, 60 Stat. 1040. The Hill–Burton Act authorized grants for the construction and modernization of health care facilities. *Id.* § 621. In exchange for grant monies, facilities were required to give assurances to provide "a reasonable volume of" uncompensated indigent care to the community. *Id.* § 622(f)(2).

Regulations issued between 1947 and 1974 essentially tracked the statute's language. During that time, enforcement of assurances was lax, and the provision of uncompensated indigent care was minimal. Responding to these inadequacies, Congress in 1975 replaced Title VI of the Public Health Service Act, the title containing the Hill–Burton Act, with a new Title XVI. Pub.L. No. 93–641, 88 Stat. 2225, 2258. This statute followed the pattern of the Hill–Burton Act, but provided teeth by requiring the Secretary of what is now the Department of Health and Human Services to prescribe regulations to ensure that assurance obligations are met. 42 U.S.C. § 300s(3). *See also id.* § 300s–6 (requiring Secretary to investigate extent of compliance).

In 1979, the Secretary promulgated regulations to ensure compliance with assurances given under the Hill–Burton Act or the new Title XVI. 44 Fed.Reg. 29,372–410 (1979). These regulations (1) specified annual levels for the provision of indigent care, (2) set eligibility criteria, (3) mandated a procedure for review of applications for uncompensated care, including a requirement that eligibility for Hill–Burton care be determined within two working days of ap-

plication and (4) provided for the maintenance of certain records. Until 1987, these regulations were enforced under a regime of "strict compliance:" even "technical" violations of the standards set out in the regulations resulted in nonrecognition of care for Hill–Burton purposes.

In 1987, the Secretary ushered in an era of "substantial compliance" when he promulgated a new set of regulations to ensure compliance with indigent care assurances. 52 Fed.Reg. 46,022–039 (1987). These regulations preserved much of the substance of the 1979 regulations, but they permitted receipt of full credit toward assurance obligations despite a failure to comply with the regulations in particular cases.

In 1988, the Secretary promulgated a regulation, without prior notice and comment, to permit "crediting towards a facility's Hill–Burton obligation, during the period for which the 1979 regulations applied to the facility, accounts in which an eligibility determination was made but the two-working-day requirement was not met." 53 Fed.Reg. 44,954, 44,955 (1988). The effect of this regulation nationwide was to restore credits worth approximately $31 million to obligated facilities for provision of care where the eligibility determination was untimely under the 1979 regulations.

In 1959 and 1964, Flagstaff Medical Center, Inc., received Hill–Burton funds totalling $420,163 and gave the required assurances.

In fiscal year 1980, Flagstaff decided to buy out its remaining Hill–Burton obligation, as it was permitted to do by regulation. To do so, Flagstaff provided over $220,000 in uncompensated care to eligible patients. It then notified HHS that it had fulfilled its Hill–Burton obligation and cancelled its program.

Shortly after, an HHS audit uncovered a shortfall of about $25,000 due to an error in computing allowable credit under Medicaid. Another, fuller audit in June, 1981, revealed that, in providing uncompensated services, Flagstaff did not comply with regulations requiring it to provide Hill–Burton applicants with a written determination of eligibility within two days of a request for services. Instead, applicants were provided only with oral notification, and often only after a period longer than two days. Flagstaff's FY 1980 program also violated regulations governing record-keeping and specifying permissible income criteria to be used in assessing a Hill–Burton application. As a result, and consistent with its strict compliance policy, HHS determined in July, 1982, that Flagstaff could not take Hill–Burton credit for any of the care provided in FY 1980. Flagstaff was assessed with a deficiency for that year and was ordered to reimplement its Hill–Burton program.

Flagstaff did not reimplement its program then or later, even though HHS again ordered it to resume the program in May, 1984. Instead, it filed an administrative appeal some 27 months after the original order, in October, 1984. HHS denied the appeal in January, 1985.

Five indigent patients, including class representatives Mazon, Salazar, Havatone and Uqualla, filed administrative complaints with HHS in 1987, alleging that Flagstaff had failed to provide them with Hill–Burton care. Each of them had received care but had been denied an opportunity to apply for Hill–Burton care. Some of them had made payments for care received. HHS ordered Flagstaff to accept Hill–Burton applications from these individuals, and, if they proved eligible, to cease all collection efforts and provide reimbursements for payments received. Flagstaff did not comply with the orders.

In July, 1988, HHS reiterated its position that Flagstaff must resume its program. In November, 1988, Flagstaff filed suit against HHS for a declaration of its Hill–Burton obligation.

In March, 1989, Coconino County Legal Aid and the National Health Law Program filed a class action against Flagstaff and the Secretary on behalf of all indigent persons residing in Coconino County who had been, were being or would be denied Hill–Burton care. The class plaintiffs alleged that the 1987 and 1988 regulations were invalid, and they sought relief under the Fifth and Fourteenth Amendments, the

Hill–Burton Act and various state laws for Flagstaff's failure to provide Hill–Burton care.

The district court consolidated these cases and certified the class in the second suit. In January, 1990, the court dismissed the first suit with prejudice based on a settlement agreement between Flagstaff and the Secretary.

Under the settlement agreement, Flagstaff undertook to reinstate its Hill–Burton program and to provide $382,763 in care to liquidate its assurance obligation. Pursuant to those undertakings, Flagstaff provided more than $650,000 in uncompensated indigent care between March and May, 1990.

By an amended order dated August 22, 1991, the district court granted partial summary judgment in favor of the class plaintiffs. *Flagstaff Medical Center, Inc. v. Sullivan*, 773 F.Supp. 1325, 1363–65 (D.Ariz.1991). The court invalidated the 1988 regulation for failure to comply with the notice and comment provisions of the Administrative Procedure Act and ordered the Secretary to direct Flagstaff to provide uncompensated care in an amount equal to all the credit it received as a result of the 1988 regulation. *Id.* at 1363–64. The court also held that the class plaintiffs were entitled to judgment on their Hill–Burton and state law contract claims and ordered the following relief: (a) refunds to named class plaintiffs of all payments made to Flagstaff for services rendered after cancellation of the Hill–Burton program in 1980; (b) publication of notices inviting persons who received medical services at Flagstaff between cancellation and reimplementation of its Hill–Burton program to apply for benefits; (c) refunds, without credit, to persons eligible for Hill–Burton care during the program hiatus; (d) reinstitution of the program at a dollar amount that does not give credit for FY 1980 violations of the two-day written determination requirement; (e) permanent cessation, without credit, of collection efforts against those eligible for Hill–Burton services when they received care during the program hiatus; (f) correction of credit reports of class plaintiffs to delete references to unpaid bills owed to Flagstaff; and (g) reinstitution of the Hill–Burton program at a dollar amount that does not permit credit for uncompensated care given during the program hiatus. *Id.* at 1363–65.

By an order dated October 31, 1991, we stayed the remedies summarized in (a)-(c) and ordered an expedited briefing schedule. On February 12, 1992, we stayed an order by the district court dated February 7, 1992, requiring Flagstaff to take certain steps to implement unstayed portions of the remedy, including resumption of its Hill–Burton program.

## II

This appeal raises questions of law, reviewable *de novo*. *See, e.g., U.S. v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## III

(A) *Mootness*—Flagstaff and the Secretary contend that this case is moot because their settlement agreement fully extinguished the Hill–Burton obligation on which the class action is predicated. The contention misconceives the nature of the primary relief sought by the plaintiff class.

The mootness doctrine asks "the basic question 'whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties.' " *Williams v. I.N.S.*, 795 F.2d 738, 741 (9th Cir.1986) (quoting 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3533, at 212 (2d ed. 1984)). The burden of demonstrating mootness is a heavy one. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

The settlement agreement between Flagstaff and the Secretary required the hospital to resume its Hill–Burton program and provide a specified volume of uncompensated indigent care. That agreement, entered into in good faith, is fully executed. Flagstaff has therefore discharged its Hill–Bur-

ton obligation to the satisfaction of the Secretary. The question then is whether the district court had authority to order Flagstaff to reinstitute its Hill–Burton program. For the answer to that question, we turn to the Act.

■ 42 U.S.C. § 300s states that "[t]he Secretary shall by regulation ... (3) prescribe the general manner in which each entity [receiving Hill–Burton funds] shall be required to comply with ... assurances ... and the means by which such entity shall be required to demonstrate compliance with such assurances." In addition, 42 U.S.C. § 300s–6 requires the Secretary to investigate and ascertain the extent of a facility's compliance with assurances and to take certain actions if a facility is not in compliance. We view these provisions as vesting the Secretary with the authority, in the first instance, to determine the extent of a facility's prospective obligation under the Hill–Burton Act. Because the Secretary made that determination in this case, and because Flagstaff discharged that obligation to the Secretary's satisfaction pursuant to the settlement agreement, we conclude that the district court was without authority thereafter to order Flagstaff to reimplement its Hill–Burton program.

■ If prospective reimplementation of the program were the only relief sought by the class plaintiffs, then, this case would be at an end. However, in addition to the kind of relief agreed to between the Secretary and Flagstaff, the class plaintiffs sought other relief against Flagstaff for its failure, over the course of some ten years, to offer the uncompensated care that it was obliged at the time to provide. They also sought to invalidate the Secretary's 1987 and 1988 regulations.

In effect, the plaintiff class sought relief for injuries caused when Flagstaff ignored an *extant* obligation to provide Hill–Burton care, even if that obligation was later formally liquidated. This relief is distinct from the relief afforded by the settlement agreement. The class plaintiffs sought a decision whose impact on them would be distinct from that provided by the settlement agreement. Such claims, if they ever existed, were not and are not mooted by the settlement agreement. .

■ The settlement agreement affords members of the plaintiff class, who were eligible for, but denied, Hill–Burton care during the critical ten year period, only partial relief for Flagstaff's failure to abide by its assurances. Partial relief in another proceeding cannot moot an action that legitimately seeks additional relief. *Wong v. Department of State*, 789 F.2d 1380, 1384 (9th Cir.1986). To the extent that Flagstaff and the Secretary argue that *no* remedies are available once a Hill–Burton obligation has been resolved and discharged to HHS' satisfaction, their argument goes to the merits rather than the threshold question of mootness.

(B) *Validity of the 1988 Regulation—* The district court held that the Secretary's 1988 regulation, restoring credit for care when the sole reason for disallowance was noncompliance with the two-day rule, violated the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b)-(c).[1] Flagstaff and the Secretary contend that this was error because the 1988 regulation was interpretative rather than substantive. They also argue that the regulation withstands scrutiny as a reasonable interpretation of the Hill–Burton Act.

The notice and comment rules do not apply when "grants, benefits, or contracts" are involved. 5 U.S.C. § 553(a)(2). However, because HHS (by its predecessor, the Department of Health, Education and Welfare) waived this exemption in 1971, *see* 36 Fed.Reg. 2532 (1971); *Bedford County General Hospital v. Heckler*, 757 F.2d 87, 90 (6th Cir.1985), the notice and comment rules govern post-waiver regulations promulgated by HHS, even if they involve grants, benefits or contracts.

■ When an agency promulgates regulations other than interpretative rules, gen-

1. Plaintiffs challenge the validity of the 1988 regulation as a whole under the Administrative Procedure Act. The question whether HHS complied with the 1988 regulation when it restored Flagstaff's disallowed credit is not before us.

eral policy statements or rules for its own organization, the APA generally requires prior notice and comment. 5 U.S.C. § 553(b)-(c); *Alcaraz v. Block,* 746 F.2d 593, 610–11 (9th Cir.1984). The exceptions are narrowly construed. *Alcaraz,* 746 F.2d at 612.

There is no bright-line distinction between interpretative and substantive rules. *Id.* at 613. Our approach to the distinction, however, is clear, and it focuses primarily on the rules themselves and their impact on agency decisionmaking, rather than their impact on the public. *See Mada–Luna v. Fitzpatrick,* 813 F.2d 1006, 1016 (9th Cir.1987); *Alcaraz,* 746 F.2d at 613.

"Interpretative rules are those which merely clarify or explain existing laws or regulations." *Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir. 1983). They are "essentially hortatory and instructional," reflecting the administrator's thinking "in particular, narrowly defined, situations." *Alcaraz,* 746 F.2d at 613 (citing cases). Because they generally clarify the application of a law in a specific situation, they are used more for discretionary fine-tuning than for general law making. *Id.*

Substantive rules, by contrast, include those that work a change in extant law or policy. *Id.* (citing *Powderly,* 704 F.2d at 1098). Substantive rules are said to create law incrementally, pursuant to authority properly delegated by Congress. *Id.* (citing cases). They are of general, rather than situational, application. *Id.*

Applying these distinctions, we conclude that the 1988 regulation is interpretative. The regulation constituted a change in HHS' discretionary enforcement practices. HHS summarized the impact of the 1988 regulation as follows:

> Under the new interpretation, services provided where an eligibility determination was not made within two working days of a request for uncompensated services *may* be credited towards satisfying an assisted facility's uncompensated services obligation, *as long as all other applicable requirements for credit are met.*

53 Fed.Reg. at 44,954–955 (emphasis added). Specifically, as applied to facilities with outstanding obligations assessed prior to the transition certification process, such as Flagstaff, HHS will assess "how much, if any, of any disallowance was due solely to noncompliance with the two-working-day requirement." *Id.* at 44,956.

The reach of the new regulation is narrow and does not substantially alter the strict compliance regime embodied in the 1979 regulations. HHS has simply changed an enforcement practice of disallowing credit solely for violations of the two-day rule. Although the two-day rule is codified in the 1979 regulations, *see* 42 C.F.R. 124.508(a) (1979), the enforcement consequences for violating the rule are not. Within certain limits, the enforcement of a regulation is a matter of agency discretion that is subject to interpretative changes. The 1988 regulation falls within these limits. As such, it was exempt from the notice and comment provisions of the APA.

We next consider whether the regulation is a valid interpretation of the requirements of the Hill–Burton Act.

To determine the proper standard of review we recognize that changes in agency interpretation must be supported by a "reasoned analysis" over and above that required for an interpretation in the first instance. *See, e.g., Seldovia Native Association, Inc. v. Lujan,* 904 F.2d 1335, 1345 (9th Cir.1990) (when agency reverses prior policy or statutory interpretation, its most recent expression is accorded less deference than is ordinarily extended and agency must "provide a reasonable rationale supporting its departure") (citing cases).

HHS provided two reasons for issuing the 1988 regulation. 53 Fed.Reg. at 44,955. The first was that it was conforming its regulations to the holding in *Douglas County Hospital v. Bowen,* No. 6–85–1078, 1988 WL 242655 (D.Minn. Aug. 3, 1988) (order). Although the class plaintiffs correctly point out that *Douglas County*

was limited to cases in which credit is denied for brief periods of time in order to verify eligibility, *see, e.g., Flagstaff,* 773 F.Supp. at 1333 n. 7, the *Douglas County* rationale is broad enough to support HHS' 1988 regulation. After a detailed discussion, the *Douglas County* court concluded that there was a complete lack of support in the legislative history of the regulations for HHS' "refusal to credit Douglas County for free care actually given ... as a means of enforcing the two-day determination rule." *See* Order at 2–6.

HHS also reasoned that the 1988 regulation was consistent with the relaxation of timing requirements under the 1987 regulations. It noted that the 1987 regulations eased the timing requirements for determining eligibility when care has already been given and permitted "a clearer enforcement focus on the most important programmatic aspects of compliance." 53 Fed.Reg. at 44,955. It concluded that "the two-day working requirement [had been] rendered moot for most purposes, while, to the extent the requirement remains, an improved enforcement mechanism exists for assuring compliance with it." *Id.* It is not unreasonable for an agency to adopt an enforcement strategy that focuses on compliance with the spirit and not simply the letter of the law. We therefore reverse that portion of the decision of the district court which struck down the 1988 regulation.

(C) *"Retrospective" Remedies*—Flagstaff and the Secretary argue that the "retrospective" remedies [2] imposed by the district court to compensate the class plaintiffs are inconsistent with the Hill–Burton Act and related regulations. They argue that the only remedy available to the class plaintiffs for Flagstaff's failure to meet its Hill–Burton obligations is a prospective liquidation of that obligation. Because Flagstaff liquidated its obligation to the Secretary's satisfaction pursuant to the settlement agreement between them, they con-

clude that the district court was without authority to impose additional remedies under the Act.

The Hill–Burton Act does not create an entitlement program under which rights to medical care vest in identifiable individuals. *See, e.g., Gillis v. U.S. Department of Health and Human Services,* 759 F.2d 565, 572 (6th Cir.1985); *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1121 (6th Cir.1981). This, however, does not end the inquiry. Even under a nonentitlement program such as Hill–Burton, plaintiffs who can demonstrate that they either were denied or failed to seek, because of an established policy, benefits for which they were then eligible, because of a facility's disregard for its statutory obligations, may seek and recover "personal redress" if such a result comports with the will of Congress.

42 U.S.C. § 300s–6 permits the Secretary to take "any action authorized by law" to ensure compliance with assurances. The same provision authorizes a private plaintiff to bring such a suit "if a complaint has been filed ... with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance ... within six months after the date on which the complaint was filed with the Secretary." The record reflects that the Attorney General did not bring a civil action for compliance for any of the class plaintiffs who filed complaints. Therefore, those class plaintiffs who qualify under the standard above described are authorized to bring suit as private attorneys general to ensure Flagstaff's compliance with its assurances. *See White v. Moses Taylor Hospital,* 763 F.Supp. 776, 782–83 (M.D.Pa.1991). The question is the extent to which remedies are available "to effectuate compliance."

The remedies countenanced by § 300s–6 and the regulations have a "prospective" component. For example, a facil-

---

**2.** Flagstaff characterizes those portions of the district court's remedies that provide "personal redress" for the failure to provide Hill–Burton care between 1980 and 1990 as "retrospective." The Secretary refers to them as "compensatory."

We use the term "retrospective" to refer to the remedies numbered 5(a)-(c) and 5(e)-(f) by the district court. *See Flagstaff,* 773 F.Supp. at 1364.

ity incurring a deficit in its annual assurance compliance level must make up the deficit, at a rate adjusted for inflation, in the following fiscal years. 42 C.F.R. § 124.511(b)(3)(i)(B) (1979). Moreover, the regulations requiring non-credit when a facility is substantially out of compliance "do not directly remedy the injury to persons who would have sought uncompensated services but for the deficiencies in the facility's program." 52 Fed.Reg. at 46,028. These authorities, however, do not suggest that they are intended to provide an exclusive remedy for all failures to meet assurances.

The 1987 regulations explicitly contemplate the application of "retrospective" relief in appropriate circumstances:

[a] facility ... that has denied uncompensated services to any person because it failed to comply with the requirements of this subpart will not be in compliance with its assurance until it takes *whatever steps are necessary to remedy fully the noncompliance,* including: (1) [p]rovision of uncompensated services to applicants improperly denied; (2) [r]epayment of amounts improperly collected from persons eligible to receive uncompensated services....

42 C.F.R. § 124.512(b) (1987) (emphasis added).[3] *See also* 42 C.F.R. § 124.512(d) (1987) (permitting same remedies with respect to undocumented or disallowed care when facility does not substantially comply with assurance regulations). HHS practice under the 1979 regulations is consistent with this approach. *See, e.g.,* CR 152 at 9, ¶ 32 (HHS ordered Flagstaff to cease collection efforts and make refunds of improperly collected monies in response to administrative complaints by named class plaintiffs alleging wrongful conduct prior to effective date of 1987 regulations).

The district court conferred relief, on a broad scale, to "remedy fully" Flagstaff's longstanding noncompliance with its assurance obligation.

We decline the invitation to adopt the contrary reasoning in *White.* There, the court stated that "since the statute and regulations explicitly enable the Secretary and the Attorney General to bring an action at law only to effectuate compliance, the plaintiff is likewise restricted ... and may not seek personal relief [including her claim to be relieved of her debt to the hospital]." 763 F.Supp. at 783. The diffi-

---

**3.** We cannot agree with the dissent that Flagstaff's formal liquidation of its assurance obligation moots the plaintiff class' attempt to secure other relief. The dissent argues that §§ 124.512(b) and 124.512(c) are mutually exclusive. There is, however, no suggestion in the text of those provisions or elsewhere that such a result was intended. We recognize that the Secretary stated:

the approach to situations where the likelihood of harm is either small or difficult to assess is to require prospective compliance, but not to disallow for past noncompliance.

52 Fed.Reg. at 46,029. These comments, however, and others like them, were made with reference to the determination whether a facility should be treated as in substantial compliance in spite of violations of particular Hill-Burton regulations. Flagstaff was not in substantial compliance. It assumes too much to read the Secretary's comments as ruling out "retrospective" relief under those circumstances. The remedies provided by § 124.512(b) may be appropriate even when it is also appropriate for the Secretary to find under § 124.512(c) that a facility is in substantial noncompliance.

The dissent's analysis does not account for the breadth of the language in § 124.512(b), which permits a full remedy to "any person" denied free care because a facility "failed to comply with the requirements of this subpart." Our reading of the regulations limits the retrospective remedy to those who can show that they would have received free care but for Flagstaff's wrongful suspension of its program. Those plaintiffs, if there are any, come within the scope of § 124.512(b). We view § 124.512(c) as consistent with § 124.512(b) because it addresses violations in a context in which there are no identifiable victims. *See* 52 Fed.Reg. at 46,028 (violations covered in § 142,512(c) "are inherently impossible to monitor or remedy adequately with respect to the people who were affected by the deficiency").

The dissent's analysis also miscasts § 124.512(b). It describes that provision as one "only ever meant as a remedy for hospitals" wishing to avoid a finding of substantial noncompliance by correcting specific errors. We cannot agree with that characterization. Section 124.512(b) appears under the heading "Enforcement." We cannot properly limit the full remedy language of § 124.512(b) to the discretion of the non-complying facility. Such a result would not comport with Congress' commitment to enforcement of Hill-Burton assurances.

culty with the *White* holding is that it ignores the necessity of affording "personal relief" to assure a "full remedy" for noncompliance.

Flagstaff, the Secretary and the American Hospital Association, as amicus, argue that the remedies fashioned by the district court are "draconian" because they expose Flagstaff to liability far in excess of their original obligation. They suggest that imposition of the remedies will discourage hospitals from participating in programs tying grant money to assurances for indigent care. In so arguing, they fail to recognize that the remedy is proportional to the substantial length of time during which Flagstaff ignored its Hill–Burton obligation. The district court's remedies were fashioned to discourage the sustained flouting of a statutory duty to provide indigent care in the face of repeated administrative orders to do so. Hospital facilities need federal grant money to build and modernize. They have no reason to avoid participation in programs like Hill–Burton so long as they discharge their assurances in a reasonably timely manner. Flagstaff failed to do so. To the extent that the district court's remedies are consistent with Congress' intent to encourage prompt compliance with Hill–Burton assurances, they comply with the Act.

Between 1947 and 1974, compliance with and enforcement of Hill–Burton assurances was "deplorably lax." *American Hospital Association v. Schweiker*, 721 F.2d 170, 178 (7th Cir.1983) (citing S.Rep. No. 1285, 93d Cong., 2d Sess. 61, *reprinted in* 1974 U.S.C.C.A.N. 7842, 7900), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984). In response, Congress enacted legislation in 1975 that was designed to improve compliance and enforcement. *Id.* In 1979, Congress reaffirmed its commitment to "vigorous[ ] and expeditious[ ]" enforcement of Hill–Burton assurances. *Id.* at 178 n. 7 (citing S.Rep. No. 96, 96th Cong., 1st Sess. 91, *reprinted in* 1979 U.S.C.C.A.N. 1306, 1396).

Flagstaff and the Secretary considered and acknowledged these obligations by requiring the hospital, pursuant to the settle-ment agreement, to reimplement its Hill–Burton program to provide a certain amount of uncompensated indigent care. The Hill–Burton Act does not permit vesting of rights *ex ante* in certain members of the plaintiff class, but "retrospective" relief may be granted to those members of the plaintiff class who can demonstrate eligibility for Hill–Burton care during the critical ten year period.

(D) *Application of State Contract Law*—The district court held that the plaintiff class was entitled to relief as a matter of state contract law. Flagstaff contends that (1) application of state contract law is preempted by the Hill–Burton Act, and (2) assuming it is not preempted, the district court erred in granting relief as a matter of Arizona law. Even though we agree that the remedies imposed by the district court were appropriate under the Hill–Burton Act, we must reach the contract issue, because the district court grounded its award of attorneys' fees on a state law that permits such an award to the prevailing party in a breach of contract suit. *Flagstaff*, 773 F.Supp. at 1361 (citing Ariz. Rev.Stat.Ann. § 12–341.01(A) (1982)).

Flagstaff does not argue that the Hill–Burton Act expressly preempts the application of state law. Instead, citing *White*, 763 F.Supp. at 791, Flagstaff suggests that state contract remedies are preempted because they would interfere with "implementation of the Hill–Burton Act."

Preemption analysis is solely a question of Congressional intent. *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (plurality opinion of Marshall, J.). It begins with the assumption that Congress did not intend to displace state law. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981).

In the absence of express preemption, "congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress" has occupied the regulatory field. *Guerra*,

479 U.S. at 280–81, 107 S.Ct. at 689 (plurality opinion of Marshall, J.). Even if Congress has not occupied the field, federal law may nevertheless preempt state law if there is an actual conflict between the two. *Id.* Finally, preemption may be necessary in fields implicating "uniquely federal interests." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1987) (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981)).

■ Because the record does not suggest that compliance with both the Hill–Burton Act and Arizona contract law is a practical or physical impossibility, *see, e.g., Maryland v. Louisiana*, 451 U.S. at 747, 101 S.Ct. at 2129, and because the remedies imposed as a matter of state contract law in this private attorney general suit are not an obstacle to full implementation of Congressional objectives, *id.*, there is no actual conflict between them. The next question, then, is whether Congress intended to occupy the field by enacting the Hill–Burton Act and authorizing HHS to issue implementary rules.

The 1979 regulations provide that "[n]othing in this subpart precludes any State from taking any action authorized by State law regarding the provision of uncompensated services ... as long as the action taken does not prevent the Secretary from enforcing the requirements of this subpart." 42 C.F.R. 124.512(d) (1979). *See also* 42 C.F.R. § 124.516(c) (1987) (same). Referring to this provision, the commentary to the 1979 regulations stated that "States are free to impose additional requirements and to make available additional legal remedies." 44 Fed.Reg. at 29,396. These regulatory pronouncements are reliable indicia of an intent not to occupy the field. Although they speak largely in terms of a *state's* ability to bring state law claims against a Hill–Burton facility, these pronouncements support the broader conclusion that Hill–Burton does not operate to the exclusion of state law. .

In *Boyle*, the Court noted that some areas of the law are "so committed by the Constitution and the laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law." 487 U.S. at 504, 108 S.Ct. at 2514. Provision of medical care to indigents is not such a field. If, in addition to the remedies available to the plaintiff class on their Hill–Burton claim, Arizona law confers on them a remedy by way of attorney fees for breach of contract, the laws of the United States are not impaired or offended.

The *Boyle* Court did state that "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Id.* But, strictly speaking, the rights claimed by certain of the class plaintiffs arise from obligations *to them*, as primary intended beneficiaries under the contract, rather than to the government. The *Boyle* Court held that, in some circumstances, "uniquely federal interests" will preempt civil liability arising under state law out of the performance of federal procurement contracts. *Id.* at 505–06, 108 S.Ct. at 2514–15. In this case, by contrast, the class plaintiffs, not the government, were intended to enjoy the primary benefit of the assurances given by Flagstaff. A federal interest is implicated in the provision of medical care to indigents, but that interest is not *uniquely federal*—no more than if Flagstaff had in fact provided the care it was bound to give and had done so negligently. Thus, the third party beneficiary claim of the plaintiff class is not preempted by the Hill–Burton Act.

In so holding, we disagree with the *White* court, which found that state contract law is preempted by the Hill–Burton Act. The court reasoned:

> If this court permitted plaintiff to proceed with the contract claim, it would effectively sanction the plaintiff's circumvention of the administrative procedures which must be followed before initiating his/her private action and, thereby, would prevent the Secretary from having the opportunity to enforce the Hill–Burton obligation, something Congress implicitly intended. Furthermore, if state law claims could be maintained

without regard to the Hill–Burton regulations, it would disrupt the Secretary's balancing of the consumer's ability to obtain free medical services with the desire to not financially overburden the medical facility. Also, allowing a state contract suit would potentially bankrupt hospitals....

*White,* 763 F.Supp. at 790–91 (citations omitted).

That analysis ignores the legislative and regulatory history of the statute. Further, it assumes a set of circumstances distinct from those present in this case: representatives of the plaintiff class did follow administrative complaint procedure, and, if there are class plaintiffs who qualify, this suit can be viewed as one for the kind of relief that the Secretary could have pursued had he chosen to do so. The concern that private actions may upset an administrative balancing between indigent care and burdens on hospitals, moreover, proves too much, since the statute itself expressly permits such actions in certain cases.

Flagstaff gave assurances for Hill–Burton monies received in 1959 and 1964. The 1979 regulations "apply to any recipient of Federal assistance under Title VI ... that gave an assurance that it would make available ... services to persons unable to pay...." 42 C.F.R. § 124.501(a) (1979). *See also* 42 C.F.R. § 124.501(a) (1987) (same). Although the determination of statutory intent is relevant in the Hill–Burton context, traditional contract analysis also has application. *Schweiker,* 721 F.2d at 182–83. *See also* Restatement (Second) of Contracts § 313 Reporter's Note to cmt. a (1981) ("recent cases have involved rights of poor people in federal-state social services agreements").

The second Restatement specifically discusses the rights of third party beneficiaries to government contracts:

[A] promisor who contracts with a government or governmental agency to do an act or render a service for the public is not subject to contractual liability to a member of the public for consequential damages resulting from ... failure to perform unless

(a) the terms of the promise provide for such liability....

....

Second Restatement at § 313(2). *See also* Restatement of Contracts § 145 (1932) (same).

Arizona has approved the Restatement approach to third party rights under government contracts. *Cole v. Arizona Edison Co., Inc.,* 53 Ariz. 141, 142–43, 86 P.2d 946, 947–48 (1939); *Lopez v. Arizona Water Co., Inc.,* 23 Ariz.App. 99, 100–01, 530 P.2d 1132, 1133–34 (Ct.App.1975).

Flagstaff gave its assurances in 1959 and 1964, when enforcement of the Hill–Burton Act was lax. At that time, even the government was not in the habit of pursuing its right to "consequential damages resulting from ... failure to perform" assurances. Viewed from the time the assurances were given, then, we might conclude that the terms of the assurances do not provide for Flagstaff's liability to third parties.

However, Flagstaff's assurances incorporate a subsequent statutory enactment evidencing an intent to make Flagstaff liable to third parties. *Cf. Wyoming Hospital Association v. Harris,* 527 F.Supp. 551, 556–58 (D.Wyo.1981) (to extent Hill–Burton assurances were contracts, their terms must permit Congress to later enact terms governing them), *aff'd,* 727 F.2d 936 (10th Cir.1984). Congress amended the Hill–Burton Act in 1979 to provide that "[a]n action to effectuate compliance with [an] assurance may be brought by a person other than the Secretary." Health Planning and Resources Development Amendments of 1979, Pub.L. No. 96–79, § 202(b), 93 Stat. 592, 635 (1979) (codified at 42 U.S.C. § 300s–6). This enactment satisfies the requirements of § 313(2)(a) of the Second Restatement.

Before Congress enacted the 1979 amendment, several courts recognized private rights of action, premised in part on third party beneficiary analysis. *See, e.g., Euresti v. Stenner,* 458 F.2d 1115, 1118–19 (10th Cir.1972); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F.Supp. 268, 271

(S.D.Fla.1971). *See also Saine v. Hospital Authority of Hall County*, 502 F.2d 1033, 1034 (5th Cir.1974) (following *Euresti*). These cases indicate that private remedy and third party analysis have been closely associated in the Hill–Burton setting. Congress' enactment of a private right of action therefore supports our conclusion that the terms of Flagstaff's assurances provide for liability to third parties.

 Arizona law provides that one can recover as a third party beneficiary only if (1) the contract itself indicates an intention to benefit the third party, (2) the benefit contemplated is intentional and direct and (3) the contracting parties intend to recognize the third party as the primary party in interest. *See, e.g., Gonzales v. Palo Verde Mental Health Services*, 162 Ariz. 387, 389, 783 P.2d 833, 835 (Ct.App. 1989) (citing cases). Members of the plaintiff class who, although eligible at the time, were denied or failed to seek Hill–Burton benefits during the critical ten year period because of Flagstaff's failure to comply with its assurances may recover under Arizona's contract law.

## IV

The settlement agreement released Flagstaff from liability to reopen its Hill–Burton program. We vacate that portion of the remedy numbered 5(g). *Flagstaff*, 773 F.Supp. at 1364–65 (requiring Flagstaff to "[r]einstitute its Hill–Burton uncompensated care program"). The 1988 regulation is valid. We therefore vacate that portion of the remedy numbered 5(d). *Id.* at 1364 (requiring Flagstaff to "[r]einstitute its program at a dollar amount that does not give it credit for violations of the two-day written determination requirement effective during 1980"). We vacate the remaining remedies imposed by the district court, *id.*, and remand for a specific determination of whether any of the class plaintiffs can demonstrate that they were eligible for Hill–Burton care during the critical ten year period. If so, those members of the class are entitled to recover appropriate "retrospective" relief to be fashioned by the district court. Pursuant to the same determination, the district court may award appropriate attorneys' fees under Arizona contract law.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for a determination of whether any of the class plaintiffs can demonstrate that they were eligible for Hill–Burton care during the critical ten year period, and if so, of the appropriate remedy, consistent with the Act, and further for the award of appropriate attorneys' fees, if any. Each side shall bear its own costs and fees for this appeal.

POOLE, Circuit Judge, concurring in part and dissenting in part:

I concur with Parts I, II, and III(A) and (B) of the majority opinion. I cannot agree, however, with the analysis in Part III(C) of the majority opinion, which grants "retrospective" remedies to the class plaintiffs.

The majority has misread the relevant statutes and regulations in such a way that the $420,163 in Hill–Burton Funds received by the Flagstaff Medical Center could end up costing the hospital over $9,000,000. Nevertheless, the majority reassures itself that it has done the right thing by noting that this procrustean penalty is "proportional to the substantial length of time during which Flagstaff ignored its Hill–Burton obligation." I am certain the irony of this rationalization will not be lost on Flagstaff, since the very same majority opinion endorses Flagstaff's interpretation of the regulations which led the hospital to 'flout its statutory duty' and 'ignore its obligation.' *See* Majority Opinion at 887, 889.

As the majority notes, the class plaintiffs are only authorized by law to bring a suit to "effectuate compliance with ... assurances" made by Flagstaff at the time it received Hill–Burton funds. 42 U.S.C. § 300s–6. The majority also correctly concludes that "Flagstaff has ... discharged its Hill–Burton obligation to the satisfaction of the Secretary," thereby complying with its assurances. Majority Opinion at 884–885. This determination should be the end of the case.

The majority proceeds, however, to grant to the plaintiff class a "retrospective remedy," arguing that 42 C.F.R. § 124.512 authorizes such relief. This is a mistaken reading of that regulation, which merely allows a hospital to avoid having the Secretary disallow all the uncompensated services provided during the preceding fiscal year. The majority instead concludes that § 124.512(b) provides for an additional penalty over and above disallowance. Such an interpretation ignores the context of the regulations, as well as the purpose behind amending the regulations in 1987 to allow health care facilities to receive credit for care provided while in "substantial compliance" with the regulations.

As the majority recognizes, the 1987 regulations "ushered in an era of 'substantial compliance.'" Majority Opinion at 883. These regulations were not intended to expose hospitals to new and potentially devastating penalties, but rather were meant to benefit them. Toward that end, § 124.511 was included to make clear when a facility was to be certified as substantially complying with the regulations. To prevent a hospital from losing credit for a failure which could be remedied, § 124.512(b) was added. *See* § 124.511(b)(1)(iii)(A). As noted in the commentary accompanying the regulations:

> The purpose of these provisions is to minimize harm, both to eligible persons and to facilities. In the context of the uncompensated services assurance, the issue to be addressed is financial: Who will bear the cost of the medical services that are provided? And, generally speaking, an error in resolving that issue produces harm that can be remedied. For example, where a facility erroneously requests full payment from a person who was eligible for discounted services under its allocation plan, it can remedy that error by ceasing collection on the amount erroneously charged, refunding any erroneous payments, and so on. Similarly, where a facility provides uncompensated services to persons whose care is covered by third party payors and charges those amounts to its uncompensated services obligation, the error can

be remedied by reducing the uncompensated services claimed by the amount of the ineligible accounts. In such situations, where a remedy is available and is provided, it is the Department's view that the intent of the statute has been met—uncompensated services have been provided to those who qualify for them—and the facility should receive appropriate credit therefor.

52 Fed.Reg. 46,028 (1987). This explanation of the new "remedy" provision came with an important limitation:

> While these provisions do not directly remedy the injury to persons who would have sought uncompensated services but for the deficiencies in the facility's program, they do ensure that the *class of persons* eligible for services does not lose them through inappropriate crediting where such basic deficiencies in a facility's uncompensated services program exists.

*Id.* (emphasis supplied). Finally, it was noted that:

> the stress on corrective action ensures both groups [service providers and consumers] that a finding of substantial compliance is made only where past noncompliance is appropriately remedied for consumers *and that it reflects and appropriately treats such remedial action in terms of a facility's uncompensated serv[ic]es obligation as a whole.*

*Id.* at 46,029 (emphasis supplied).

Thus, the penalty for failing to remedy noncompliance remained unchanged: "if the facility fails to remedy prior noncompliance where corrective action is prescribed, it is subject to losing credit for *all* uncompensated services it provided in the period covered by the corrective action." *Id.* at 46,028. In other words, the "retrospective" remedy was never intended to provide for "personal redress," nor was it to penalize a health care facility beyond its obligations as a whole. To the contrary, the "retrospective" remedy was only ever meant as a remedy for hospitals; i.e. as a means for a health care facility to remedy or correct errors which would otherwise result in the facility losing all credit for

services provided during the preceding fiscal year.

In this case, Flagstaff has refused to undertake corrective action in order to effectuate substantial compliance for the fiscal years in question, and consequently the retroactive corrective measures outlined in § 124.512(b) have no bearing on this case. Instead, this case is governed by § 124.-512(c), since the hospital was clearly in substantial noncompliance during those years. The penalty for being in substantial noncompliance is that "all of the uncompensated services claimed" are disallowed. § 124.512(c). The deficit incurred by disallowing those claims, as the majority recognizes, has already been made up as required under § 124.503(b)(2)(ii). Because the majority has misread the regulations to allow appellees to state an additional claim for "retrospective" relief over and above that provided for by statute and regulation, I must respectfully dissent.