Karen WHITE, Individually and as Personal Representative of the Estate of Kenneth V. White, Plaintiff,

v.

MOSES TAYLOR HOSPITAL, Defendant.

Civ. No. 89–1588.

United States District Court, M.D. Pennsylvania, Scranton Division.

Sept. 30, 1992.

Todd J. O'Malley, Ronald J. Worobey, John J. Brazil, Jr., Brazil & Brazil, Scranton, PA, for plaintiff.

Lawrence M. Ludwig, Scranton, PA, Brian M. Peters, Jonathan B. Sprague, Post & Schell, James B. Jordan, Office of the City Solicitor, Philadelphia, PA, for Moses Taylor Hosp.

Eileen Bradley, Chief Counsel, Dept. of Health & Human Services, Office of General Counsel, Region III, Philadelphia, PA.

Lori C. Hyman, U.S. Dept. of Justice, Federal Programs Branch, Civ. Div., Washington, DC, Carol C. Conrad, Dept. of HHS, Rockville, MD, for Dept. of HHS.

Karen White, pro se.

Lori C. Hyman, U.S. Dept. of Justice, Federal Programs Branch, Civ. Div., Washington, DC, for U.S.

## MEMORANDUM

NEALON, District Judge.

By Memorandum and Order dated April 9, 1991, this court held that the plaintiff, the widow of Kenneth V. White, could not obtain personal relief under the Hill–Burton Act (HBA), 42 U.S.C. § 291 et seq., and regulations adopted by the Secretary of Health and Human Services,[1] from medical costs incurred by her late husband while a patient at defendant Moses Taylor Hospital.[2] Although it was decided that the plaintiff could not maintain a private action that encompassed personal relief from the decedent's hospital bill, the issue of whether the plaintiff would, nevertheless, be entitled to the forgiveness of the debt as a result of her lawsuit as a "private attorney general" to enforce the hospital's compliance with its statutory and regulatory obligations to provide a certain amount of "uncompensated services" to patients of limited financial resources was left open.[3] In other words, where a medical facility did not comply with the regulatory requirements, what was the extent of its liability, if any, to former patients who were eligible and may have received "uncompensated services" relief if the facility had instituted the program as required? See White v. Moses Taylor Hospital, 763 F.Supp. 776 (M.D.Pa.1991).[4]

Briefs on the issue were submitted, including an amicus curiae by the Secretary, and oral argument took place on March 23, 1992. Subsequently, the parties were requested to file supplemental briefs addressing the opinion of the Ninth Circuit Court of Appeals in Flagstaff Medical Center, Inc. v. Sullivan,

---

1. 42 C.F.R. § 124.501 et seq., (1979 and 1987 editions).

2. The defendant's motion to dismiss was granted as to the plaintiff's claims under 42 U.S.C. § 1983; the Fifth and Fourteenth Amendments to the United States Constitution; pendent state claims; and punitive damages.

3. As noted in the Memorandum, the plaintiff's eligibility under the HBA, the effect of the agreement between the defendant and the Secretary of Health and Human Services to satisfy the defendant's assurances under the HBA (government stated that there were no records of an oral or written agreement between Secretary and hospital), and exhaustion of administrative remedies were not addressed.

4. Although the factual history of this case has been extensively set out in this court's earlier opinion, and reiterated in the discussion infra pages ——–——, a brief summary of the hospital's Hill–Burton activities is helpful in understanding the relationship between Moses Taylor and the HHS.

Moses Taylor's Hill–Burton obligation began on March 14, 1967, for a period of 20 years. In 1980, seven years before the hospital was required to extinguish its debt, it determined that it had satisfied its Hill–Burton obligation by providing uncompensated services to those who had requested them in the years between 1967 and 1979. Moses Taylor so informed the HHS in 1980. In 1987, the HHS notified the hospital of an impending audit, and the necessity of providing the appropriate documentation to substantiate its claim of compliance with its Hill–Burton obligation. The hospital could not produce the documentation and, accordingly, in 1988, the HHS concluded that the hospital would not receive credit for uncompensated services, in total, from 1967 to 1980, and from 1979 (the date the new regulations took effect) to 1987. The hospital reimplemented its Hill–Burton program in 1989 and, thus, was also not in compliance from 1988 to 1989. See infra note 20.

962 F.2d 879 (9th Cir.1992), and the final submission was made by the Secretary on June 15, 1992. Accordingly, the motions of both parties for summary judgment are ripe for disposition and, for reasons which follow, the court will deny the plaintiff's motion and grant that of the defendant.

## I.

The plaintiff's deceased spouse was hospitalized at Moses Taylor Hospital in September and October of 1983 and incurred a medical bill in the amount of $217,321.00. At that time, the Hospital did not inform the plaintiff of the availability of uncompensated services to eligible patients apparently because it believed its HBA obligation had been satisfied and had terminated its program in 1979. As a result of the plaintiff's failure to pay the bill, a collection action was instituted on August 18, 1984, and on April 24, 1985, a default judgment was entered against Karen White in the Court of Common Pleas of Lackawanna County.[5] Subsequently, the plaintiff obtained a stay of proceedings in the Court of Common Pleas and initiated the above-captioned suit on November 3, 1989.

On July 22, 1991, the defendant filed a motion for summary judgment. The Hospital maintains that it is entitled to summary judgment under the HBA because the plaintiff Karen White (White) failed to apply for uncompensated services. The plaintiff also submitted a summary judgment motion on September 19, 1991, contending that two requests for uncompensated services were made on her behalf by Salvatore Pileggi (Pileggi)[6] in March 1989 and, thus, if eligible financially for HBA funds, her entire debt to the hospital should be extinguished.[7]

At a March 23, 1992, hearing on the motions for summary judgment, the court raised the additional issues of: (a) whether a private action to enforce compliance encompasses the forgiveness of the plaintiff's debt, and the debt of all other eligible patients, because of the hospital's failure to give proper notice; (b) whether under § 124.512(b) the hospital may be required to exceed its Hill–Burton obligation to "remedy fully" its noncompliance with the Act; (c) whether the plaintiff has exhausted her administrative remedies with the Secretary under § 124.511; and, finally, (d) what is the proper scope of this court's review of the Secretary's interpretation of his own regulations?

## II.

"As a general rule, if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, then summary judgment is appropriate." *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990) (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citation omitted). Further, "[s]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "The facts must be viewed in the light most favorable to the party opposing the motion." *Cruz v. Chesa-*

---

**5.** The parties entered into an agreement on July 18, 1986, whereby the plaintiff sold certain real estate in Newton Township and from the proceeds of that sale, the defendant hospital received $32,000.00 in partial satisfaction of the deceased's outstanding balance, reducing it to $184,721.00. However, this figure is essentially undisputed due to the plaintiff's belief that she should not only be reimbursed for the money she had paid to the hospital but also relieved of any balance due.

**6.** Throughout this litigation, Salvatore Pileggi has been acting as a self-described attorney in fact, "representing" Mrs. White's interests by

filing papers, etc., on her behalf. He also holds an option to purchase the real estate owned by Mrs. White and presently encumbered by the judgment lien, in the event that the lien is removed. *See* document 86, pages 44–64, of record.

**7.** On October 3, 1992, HHS initiated an assessment of Moses Taylor's Hill–Burton program to determine whether it was in compliance with its obligation to reinstitute the program as directed by the Secretary in 1988. The disposition of the motions was held in abeyance pending the Secretary's investigative audit.

*peake Shipping, Inc.,* 932 F.2d 218, 223 (3d Cir.1991) (citation omitted).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III.

■ The court will first address the decision in *Flagstaff, supra,* and, with due respect, decline to adopt the reasoning of the majority of that panel. The majority, in short, concluded that a private cause of action is provided for under the statute and regulations and a district court *may* grant full relief retrospectively from any debt owed to the medical facility by all persons eligible for "uncompensated services" during the period that the medical facility was not in compliance with its Hill–Burton obligations.

In an earlier opinion,[8] this court held that no private cause of action for personal relief was contemplated by the Hill–Burton Act. "In the context of this issue, both the statute and regulations are very explicit in restricting the 'private action' to effectuating a medical facility's compliance with its assurances." *White,* 763 F.Supp. at 782 (*citing* 42 U.S.C. § 300s–6; 42 C.F.R. § 124.511(a)(4); and *Oldfield v. Athletic Congress,* 779 F.2d 505 (9th Cir.1985)). It was held that the scope of the Act's enforcement scheme, §§ 124.-511(a)(4) and 124.512(a), contemplated no more than the substitution of the private plaintiff for the Attorney General in an action to effectuate compliance. Therefore, a "private action" exists only to the same extent as

it would for the Secretary or Attorney General and, accordingly,

the plaintiff cannot institute a "private action" with any more remedial authority than that which the Secretary or the Attorney General possesses. Thus, since the statute and regulations explicitly enable the Secretary and the Attorney General to bring an action at law only to effectuate compliance, the plaintiff is likewise restricted to enforcing the Hospital's compliance with its "assurances" and may not seek personal relief.

*Id.,* 763 F.Supp. at 783. The panel majority in *Flagstaff* rejected that rationale, noting that "the difficulty with the *White* holding is that it ignores the necessity of affording 'personal relief' to assure a 'full remedy' for noncompliance." *Flagstaff,* 962 F.2d at 888, 889 (the regulations "do not suggest that they are intended to provide an exclusive remedy for all failures to meet assurances"). The panel majority read the enforcement provision of the 1987 regulations, § 124.-512(b) (otherwise known as the "individual remedy" provision), as "explicitly contemplat[ing] 'retrospective' relief in appropriate circumstances,"[9] notwithstanding a contrary interpretation of his regulations by the Secretary. *Id.* at 888. Circuit Judge Poole, in dissent, expressed the view that:

[a]s the majority notes, the class plaintiffs are *only* authorized by law to bring a suit to "effectuate compliance with ... assurances" made by Flagstaff at the time it received Hill–Burton funds.... Thus, the penalty for failing to remedy noncompliance remained unchanged: "if the facility fails to remedy prior noncompliance where corrective action is prescribed, it is subject to losing credit for *all* uncompensated services it provided in the period covered by

---

8. *White v. Moses Taylor Hospital,* 763 F.Supp. 776 (M.D.Pa.1991).

9. This section reads in pertinent part:
   **§ 124.512—Enforcement.**
   (b) A facility, including a facility certified under Section 124.513 or Section 124.514, that has denied uncompensated services to any person because it failed to comply with the requirements of this subpart will not be in compliance with its assurance until it takes what-

ever steps are necessary to remedy fully the noncompliance, including:
   (1) Provision of uncompensated services to applicants improperly denied;
   (2) Repayments of amounts improperly collected from persons eligible to receive uncompensated services; and
   (3) Other corrective actions prescribed by the Secretary.
42 C.F.R. § 124.512(b) (1987 ed.).

the corrective action. In other words, the "retrospective remedy was never intended to provide for "personal redress," nor was it to penalize a health care facility beyond its obligations as a whole.

*Flagstaff,* 962 F.2d at 893 (citations omitted). The *Flagstaff* dissent obviously agrees with the Secretary's interpretation of the regulations and, as the discussion below illustrates, a modification of this court's position is not warranted.

## IV.

At the outset, the Secretary's interpretation of his regulations should be examined as the law is clear that an agency's interpretation of its own regulations is accorded great deference by a reviewing court. *See* the court's discussion *infra* at pages 635–636. The Secretary, in interpreting his own regulations, has explicitly rejected the *Flagstaff* holding. According to the Secretary, § 124.-512 [10] was not intended to function as a punitive device to force hospitals into complying with their Hill–Burton obligations. On the

contrary, the Secretary argues that the individual remedy provision does not provide for retrospective benefits to all who may have been eligible for uncompensated services but is only applicable to those patients who had applied for, and had been improperly denied, funds *while a Hill–Burton program was in operation.* The individual remedy provision "contemplates the existence of an entitlement to the benefit, and an entitlement can only exist when the prerequisites for determining eligibility (e.g., an allocation plan) exist." *See* document 62, p. 21, of record. In other words, a person unable to pay for hospital services who was eligible for Hill–Burton relief under a facility's existing allocation plan, and whose claim was erroneously denied because of a facility's failure to comply with the regulations, could then turn to the individual remedy provision for relief.[11] *See* 44 Fed. Reg. 29396. Only in that event may an affected person seek to require the hospital to provide relief in excess of its total uncompensated services obligation to "remedy fully the noncompliance." *See* document 62, p. 27, of record. While the facility may be faulted

10. Although not at issue in *Flagstaff,* the Secretary argues that § 124.511(b)(2) of the 1979 regulations should be interpreted the same as § 124.512(b). Section 124.511(b)(2), the enforcement provision of the 1979 regulations, reads in pertinent part:

> § **124.511—Investigation and enforcement.**
> (b) *Enforcement.*
> (2) A facility that has denied uncompensated services to any person because it failed to comply with the requirements of this subpart will not be in compliance with its assurance until it takes whatever steps are necessary to remedy fully the noncompliance.
> 42 C.F.R. § 124.511(b)(2) (1979 ed.)

11. 42 C.F.R. § 124.505(a)(1) and (3) provides that the service rendered by a facility must be covered by the facility's allocation plan in effect at the time of the request. Section 124.505(a)(1) and (3) read in pertinent part:

> § **124.505—Eligibility criteria.**
> (a) A person who is unable to pay for health services is a person who—
> (1) Is not covered, or receives services not covered, under a third-party insurer or governmental program, except where the facility fails to participate in a program in which it is required to participate by Section 124.603(c):
> (3) Requests services *within the facility's allocation plan* in effect at the time of the request.
> 42 C.F.R. § 124.505(a)(1) and (3) (1987 ed.) (emphasis supplied). Furthermore, the facility must

make a determination of eligibility where there has been a request for uncompensated services.

> § **124.508—Determinations of eligibility.**
> (a) *Determinations.* In any period or periods in a fiscal year in which uncompensated services are available, the facility shall make a determination of eligibility for uncompensated services within two working days following the request for uncompensated services. The facility shall give the applicant a copy of the determination promptly.
> 42 C.F.R. § 124.508(a) (1979 ed.).
> § **124.507—Written determinations of eligibility.**
> (a) Determinations of eligibility must be in writing, be made in accordance with this section, and a copy of the determination must be provided to the applicant promptly.
> (c) *Timing of determinations*—(1) *Preservice determinations.* (i) Facilities other than nursing homes shall make a determination of eligibility within two working days following a request for uncompensated services which is made before receipt of outpatient services or before discharge for inpatient services.
> 42 C.F.R. § 124.507(a) and (c). For Mrs. White to have received the relief granted in the individual remedy provision she would have to show first that she was eligible for the services and, second, an erroneous determination made by the hospital that denied her Hill–Burton funds pursuant to an allocation plan already in effect, none of which she has been able to do.

for not having a plan in effect, the regulations did not contemplate retrospective relief to all eligible persons. As the Secretary noted, determining, long after the fact, the identities of those who may have been eligible for the twenty-two-year period during which the hospital could not document compliance would be a near-impossible task. Moreover, because a participating facility "owes a fixed, limited dollar amount of uncompensated services over time," even if a plan had been in existence, there is no right granted to any eligible person that uncompensated services will be provided. *See* document 62 of record; *Newsom v. Vanderbilt University*, 653 F.2d 1100, 1120–21 (6th Cir. 1981); *Davis v. Ball Memorial Hospital Ass'n.*, 640 F.2d 30, 38 (7th Cir.1980). Indeed, it is the community, or the class of eligible individuals, to which a facility operating a Hill–Burton program owes a duty to provide uncompensated services, and not to a particular individual. Thus, once Moses Taylor fulfilled its financial quota, it then had no responsibility to forgive debts of those otherwise eligible. *See generally Newsom*, 653 F.2d at 1120–21, n. 5 (Congress did not intend for all eligible to receive Hill–Burton care).

It is undisputed that Moses Taylor did not have a Hill–Burton program in effect between June 30, 1979 and July 1, 1989. The plaintiff's alleged first request for uncompensated services occurred in 1984; the second, through Salvatore Pileggi, allegedly occurred on March 6 and 24, 1989. Both requests fell within the period when there was no program extant because Moses Taylor had purportedly satisfied its obligation and, thus, if the court accepts the Secretary's interpretation of his own regulations, the individual remedy provision is not applicable.

The Secretary posits further that the plaintiff is not entitled to the forgiveness of her debt because, under the regulations, a Hill–Burton facility's *total failure* to operate a program is remedied by requiring the facility to make up its deficit *prospectively*, by providing the requisite amount of uncompensated services to the class of potentially eligible individuals through the *reopening* of its program. This prospective relief interpretation, argues the Secretary, is implicit in the regulatory structure, particularly in the "excess credit compliance" provision and "deficit" provision of § 124.503(b) of the regulations.[12]

In addition, § 124.511(b)(3)(i)(B) requires that a deficit due to a facility's total noncompliance with the regulations is remedied by providing uncompensated services in the fiscal year following the Secretary's finding.[13]

---

**12.** Section 124.503 of both the 1979 and 1987 regulations reads in pertinent part:

§ **124.503. Compliance level.**

(b) *Deficit in compliance.* (1) *Facilities assisted under Title VI.*—If in any fiscal year a facility assisted under Title VI of the Act fails to meet its annual compliance level, it shall provide uncompensated services in any amount sufficient to make up that deficit (as adjusted under paragraph (d)). *The facility may make up a deficit at any time during its period of obligation or in the year or years following,* except where the facility failed to provide uncompensated services at the required level although financially able to do so, or where the facility did not comply with the requirements of this subpart.

42 C.F.R. § 124.503(b) (1979 ed.) (emphasis supplied).

§ **124.503 Compliance level.**

(b) *Deficits.* If in any fiscal year a facility fails to meet its annual compliance level, *it shall provide uncompensated services in an amount sufficient to make up that deficit in subsequent years,* and its period of obligation shall be extended until the deficit is made up.

(2) *Timing of Deficit make-up*—(i) *Justifiable deficits.* (A) *A facility assisted under Title VI of the Act may make up a justifiable deficit at any time during its period of obligation or in the year (or years, if necessary) immediately following its period of obligation.*

(ii) *Noncompliance deficits.* (A) A facility must begin to make up a noncompliance deficit *in the fiscal year following the finding of noncompliance by the Secretary.*

42 C.F.R. § 124.503(b)(2)(i), (ii) (1987 ed.) (emphasis supplied). The court would note that under the 1979 regulations, if a facility failed to provide uncompensated services when financially able to do so, or failed to comply with the requirements of the subpart, the facility was required to make up the entire debt the year following the Secretary's finding of noncompliance.

**13.** This section reads in pertinent part:

§ **124.511 Investigation and enforcement.**

(b) *Enforcement.*

(3)(i) If in a fiscal year a facility fails to provide uncompensated services in an amount sufficient to meet its compliance level, and the Secretary determines—

According to the Secretary, this section contemplates requiring a facility to provide uncompensated services to the present or future class of eligible individuals and specifically declines requiring a facility to review its records to compensate patients from prior years. Furthermore, as previously stated, it would be an enormous undertaking for the hospital to attempt to determine retrospectively (back to March 14, 1967) which individuals were eligible for benefits during the years the hospital did not operate an uncompensated services program.

In summary, it is the Secretary's interpretation of his own regulations that, in order for the plaintiff to be entitled to an individual remedy, (a) the hospital must have an uncompensated services program in operation; (b) the services rendered to the patient must have been included in the allocation program; (c) the amount of the quota for that year must not have been met; (d) the hospital must formally determine if the plaintiff is eligible to receive uncompensated services, and .(e) the hospital must have wrongfully denied her services. The Secretary argues further that, even though the plaintiff may still apply for relief under the hospital's present plan, she may be found ineligible due to the HHS's policy whereby her account would not be considered "open" inasmuch as it was closed by the entry of the judgment against her in the County Court. Finally, it is the Secretary's position that if the plaintiff is denied eligibility by the hospital, she must appeal that denial to the Secretary before it may be raised in court.[14]

### V.

Not discussed by the *Flagstaff* court, nor the plaintiff in this case, was the deference that should be accorded an administrator's interpretation of his own regulations. It is well settled that an "agency's interpretation of its own regulations is entitled to considerable deference" and should be given substantial weight "unless it is plainly erroneous or inconsistent with its own regulations." *Disabled in Action of Pennsylvania v. Sykes,* 833 F.2d 1113, 1117 (3rd Cir.1987); *Dept. of Navy, Military Sealift Com. v. F.L.R.A.,* 836 F.2d 1409, 1410 (3rd Cir.1988); *Director, OWCP, U.S. Dept. of Labor v. Mangifest,* 826 F.2d 1318, 1323 (3rd Cir.1987); *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 263 (3rd Cir.1992); *Bowles v. Seminole Rock and Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). In *Flagstaff,* and in the present case, the Secretary has interpreted his own regulations to preclude retroactive relief. An "agency's construction of its own regulations has been regarded as especially due that respect." *Monongahela Valley Hospital, Inc. v. Sullivan,* 945 F.2d 576, 591 (3rd Cir.1991) (*quoting Ford Motor Credit Company v. Milhollin,* 444 U.S. 555, 556, 100 S.Ct. 790, 792, 63 L.Ed.2d 22 (1980)); *see also Alcan Aluminum,* 964 F.2d at 262.

The Third Circuit Court of Appeals has stated that the court *must* defer to the agency's consistent interpretation of its own regu-

---

(B) that the deficit was due to the facility's failure to comply with a requirement of this subpart—*the facility shall provide uncompensated services in an amount sufficient to make up the deficit in the fiscal year following the finding,* unless the Secretary determines that it is financially unable to do so.... 42 C.F.R. § 124.511(b)(3)(i)(B) (1979 ed.) (emphasis supplied). *See also* 42 C.F.R. § 124.-503(b)(2)(B)(ii) (1987 ed.) ("A facility must begin to make up a noncompliance deficit in the fiscal year following the finding of noncompliance by the Secretary.").

14. On August 26, 1991, the plaintiff applied to the hospital for Hill–Burton funds which was subsequently denied because of the plaintiff's failure to provide current financial data. On October 8, 1991, the plaintiff filed an administrative complaint with the Secretary alleging defects in the hospital's published and individual written notices and an improper denial of uncompensated services. The Secretary, on March 12, 1992, denied the appeal as to the claim of improper denial of uncompensated services and required prospective corrective action only as to the notice deficiencies. As the plaintiff has not amended her complaint to include the Secretary's March 12, 1992, determination, that issue is not before the court. Had it been, the court would review the Secretary's decision pursuant to the Administrative Procedure Act, 5 U.S.C. § 7.06(2)(A) (1982), to determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* document 89 of record; *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 413–14, 91 S.Ct. 814, 820, 822, 28 L.Ed.2d 136 (1971).

lations, *Mangifest*, 826 F.2d at 1323; *Bonessa v. United States Steel Corp.*, 884 F.2d 726, 731–32 (3rd Cir.1989) (noting that the Third Circuit in *Mangifest* "acknowledged the Supreme Court's mandate that courts *must* defer to an agency's consistent interpretation of its own regulations"), unless it "cannot understand the agency's reasoning, it is self-contradictory, or it is ambiguous." *Mangifest*, 826 F.2d at 1324. To accomplish this, the court "must understand how the agency connects its position to the language of the regulation in order to evaluate its plausibility." [15]

Upon a thorough review of the present record, the hearings and conferences, the Secretary's several memoranda in support of his interpretation of his own regulations, argument from counsel on both sides of the dispute and the court's own independent research, the undisputed facts support the Secretary's interpretation of the regulations at issue. The Secretary's interpretation is reasonable and consistent not only with his presentation to the *Flagstaff* court, but with the regulations themselves. Furthermore, the plaintiff has offered no plausible reason *not* to defer to the agency's interpretation. While the court is ever mindful that it "may not simply abdicate its responsibility by mumbling an indiscriminate litany of cases that extends 'great deference' to administrative conclusions," *Hi–Craft Clothing Company v. N.L.R.B.*, 660 F.2d 910, 914 (3rd Cir. 1981), it must defer to the Secretary's interpretation of his own regulations here, where it cannot be shown that the interpretation is "plainly erroneous or inconsistent with its regulations." *Mangifest*, 826 F.2d at 1323.

The court concludes that the undisputed facts show that the Secretary has made a reasoned analysis of his own regulations and deference to his interpretation is appropriate. Furthermore, the court independently reaches the same conclusion after a careful review of the facts of record and the statute and regulations. Therefore, the court holds that the plaintiff is not entitled to relief under the individual remedy provision; the remedy to correct the hospital's total noncompliance is prospective in nature; and individual relief [16] is thus precluded.

## VI.

■ Finally, even if the court had the discretion to fashion a private remedy, as the majority in *Flagstaff* suggests, it would not do so under the circumstances of this case. In *Flagstaff,* unlike here, the Ninth Circuit Court of Appeals determined that "[t]he district court's remedies were fashioned to discourage the sustained flouting of a statutory duty to provide indigent care in the face of repeated administrative orders to do so."

There are profound differences in posture between both hospitals in these cases. Flagstaff Medical was notified several times by the HHS that it was not in compliance with its Hill–Burton obligations after several HHS audits had revealed that Flagstaff's buy-out of its remaining Hill–Burton obligation was deficient. Two audits were completed by June of 1981 in which a discrepancy of $25,-000.00 was found and a determination that Flagstaff had violated several regulations governing written notification of recipient eli-

**15.** The *Mangifest* court noted that:

The deference owed to an agency's construction of its regulations under *Bowles* differs from that owed a construction of the statute in that the agency view of its regulations need not persuade in order to mandate a court's deference but must only be not "plainly erroneous or inconsistent" with the regulation. Less agency reasoning is therefore required.

To understand whether even the *Bowles* standard is met, however, we must still understand how the agency finds its position in the language of the regulation. Furthermore, as in the context of statutory interpretation, the lack of a reasoned analysis suggests that the agency view may not truly represent the prod-

uct of the agency's deliberate consideration. We therefore believe that even in the case of interpretations of regulations, we must distinguish between a position and a reasoned interpretation and defer only to the latter. *Mangifest,* 826 F.2d at 1324, n. 12.

**16.** Having concluded that it will defer to the agency's interpretation of its own regulations, the issue of whether Mrs. White had actually made a request for uncompensated services in 1984 and March 6 and 24, 1989, is not addressed. As noted in the court's discussion, all three alleged requests fell within the period that *Moses Taylor* had not been operating a Hill–Burton program, rendering inapplicable the individual remedy provision.

gibility, record keeping, and specifying permissible income criteria to be used in reviewing a Hill–Burton application. *Flagstaff,* 962 F.2d at 883. As a result of the audit, the HHS determined that Flagstaff was not in compliance with its Hill–Burton regulations for the 1980 calendar year and ordered the hospital to reimplement its program. *Id.* No resumption ensued, and the HHS repeated its order to Flagstaff to reimplement its Hill–Burton program in May of 1984. *Id.* Again the order was rejected and, instead, the hospital filed an administrative appeal to the Secretary in October of 1984, 27 months after it was first ordered to reimplement its program. *Id.* The Secretary denied Flagstaff's appeal in January of 1985. *Flagstaff,* 962 F.2d at 883.

Flagstaff's resistance to the HHS directive did not end with its appeal. The Secretary ordered the hospital to accept Hill–Burton applications from five indigent patients who had filed administrative complaints with the HHS over Flagstaff's alleged failure to provide them access to Hill–Burton funds. *Id.* Again, the hospital ignored its directive from the HHS which prompted a renewed demand by the agency that Flagstaff resume its Hill–Burton program. *Id.* Finally, in November of 1988, the hospital filed suit against the

Secretary for a declaration of its Hill–Burton obligation under the act. *Id.*

The relationship between Moses Taylor Hospital and the HHS was quite different. Here, the defendant's obligation to provide Hill–Burton assistance grew out of its receipt of federal funds in 1967. *See* document 59 of record. The unchallenged evidence of record reveals that the hospital operated its Hill–Burton program for 13 years after its receipt of funding and concluded, in 1980, by way of letter to the HHS that it considered its Hill–Burton obligation to be satisfied, as it was allowed to do under the regulations.[17] *Id.* One year later, in July of 1981, in response to the letter from Michael Winthrop, the hospital's assistant administrator, dated July 8, 1980, the HHS responded that the hospital could cease its Hill–Burton program if it believed in good faith that its obligation had been satisfied and if it could prove compliance by later producing verifiable records.[18] *Id.,* exhibit C.

Shortly after receiving the HHS letter, and prior to an HHS audit, the defendant apparently interpreted the letter to mean that its compliance had been certified and asserts that the requested records were destroyed. *See* document 59 of record. On October 2,

17. The hospital was entitled to cease operation of its Hill–Burton program if it determined it had met its annual compliance level or the appropriate level for the period specified in its allocation plan. Section 124–510(b)(2) allows for the cessation of uncompensated services and reads, in pertinent part:

**§ 124.510 Reporting and record maintenance requirements.**

. . . . .

(b) *Record maintenance requirements.*

. . . . .

(2) In any fiscal year a facility may stop providing individual written notice, and may stop making eligibility determinations, only if it maintains records that document on a current basis that it has met its annual compliance level for the fiscal year or appropriate period specified in its allocation plan.
42 C.F.R. § 124.510(b)(2) (1979 ed.). The analogous provision in the 1987 regulations is § 124.-508 and it reads, in pertinent part:

**§ 124.508 Cessation of uncompensated services.**

(a) *Facilities not certified under § 124.513, 124.512, or § 124.515.* Where a facility, other than a facility under § 124.513, § 124.514, or § 124.515, has maintained the records re-

quired by § 124.510(a) and determines based thereon that it has met its annual compliance level for the fiscal year or the appropriate level for the period specified in its allocation plan, it may, for the remainder of that year or period:
(1) Cease providing uncompensated services;
(2) Cease providing individual notices in accordance with § 124.504(c);
(3) Remove the posted notices required by § 124.504(b); and

. . . . .

42 C.F.R. § 124.508 (1987 ed.).

18. The Seventh Circuit Court of Appeals has noted that:

[the] 20–year limitation [on the Hill–Burton uncompensated care obligation] is not explicitly incorporated in the statute, but was judicially engrafted onto it as representing a reasonable period of time over which to require the provision of uncompensated services, as measured by the compliance standards included in the 1972 regulations.
*American Hospital Ass'n v. Schweiker,* 721 F.2d 170, 181 (7th Cir.1983) (citation and footnote omitted).

1987, the HHS notified Moses Taylor that it would conduct an audit on the hospital's asserted compliance. The hospital notified the HHS by letters dated October 16 and 19, 1987, that it had destroyed the records substantiating its claim that it had extinguished its Hill–Burton obligation and, on August 23, 1988, the HHS stated that, because the necessary documentation could not be produced, an audit could not be conducted and, therefore, it must be concluded that the hospital was not entitled to claim credit for uncompensated services for the period from 1967 to 1980. *See* document 70, exhibit B of record.[19] In addition, the hospital was notified that it had "provided no creditable uncompensated services from September 1, 1979 ... to June 30, 1987." *See* document 62, page 14, of record.[20] Consequently, in response to this adverse ruling, the defendant re-instituted its Hill–Burton program in July of 1989 without further objection and continues the program until the present time.[21] It so notified the HHS by letter dated March 6, 1990.

The plaintiff argues that the factual scenarios concerning the two hospitals are indistinguishable and urges this court to follow the *Flagstaff* holding. *See* document 93 of record. She makes reference to the "period when they (meaning Moses Taylor Hospital) were *flaunting* their non-compliance." *Id.* (emphasis supplied). Furthermore, the plaintiff characterizes the hospital's noncompliance with the HBA as a "continual" and "flagrant disregard" of its Hill–Burton obligation, likening the present case to that of *Flagstaff. Id.*

**19.** In its brief in support of its motion for summary judgment, the Hospital alleges that it was informed of the Secretary's determination by letter dated February 2, 1990. No explanation for the discrepancy has been offered, and the court concludes that its resolution is not necessary to the disposition of the motions.

**20.** The hospital could not produce records substantiating its compliance with its Hill–Burton obligation from March 14, 1967, the date of the original grant from the HHS, to June 30, 1989, the day before the hospital reimplemented its Hill–Burton program.

**21.** The parties have made several references to an agreement made between the Secretary and

Here, there is no evidence of "flouting" in the factual setting of this case and certainly not "in the face of repeated administrative orders." *See Flagstaff,* 962 F.2d at 889. On the contrary, the Secretary has not accused, nor has even suggested, that the hospital was involved in any effort to ignore or disregard administrative requests to implement an erroneously terminated Hill–Burton program. Indeed, the undisputed facts of the present case show just the opposite, namely, that the hospital, in good faith, believed it had discharged its Hill–Burton obligations but, through administrative error, had inadvertently destroyed the necessary documentation to substantiate its position. In 1983 when the plaintiff's deceased husband had been a patient at Moses Taylor, the hospital felt that it had already satisfied its Hill–Burton obligations and, therefore, did not notify the White's of the availability of Hill–Burton funds. Nothing in the present record supports the plaintiff's position that "because of a flagrant disregard for its statutory obligations," *see* document 93 of record, Moses Taylor failed to meet its Hill–Burton obligations, unlike the "sustained flouting of a statutory duty" found in *Flagstaff. Flagstaff,* 962 F.2d at 889. Accordingly, the court concludes that even under the alternate theory that it possesses the discretion to fashion a "personal remedy" for the plaintiff, the undisputed facts show that its exercise is not warranted.

Therefore, the court will grant the defendant's motion for summary judgment and deny the plaintiff's summary judgment motion. An appropriate Order will be entered.

Moses Taylor Hospital concerning the reimplementation of its Hill–Burton program. The agreement has not been made part of the record and, as such, has no relevance to the present motions. Moreover, the Secretary contends that it has no "records of an oral or written 'agreement' being entered into between the hospital and the Secretary. To the extent that there may be an understanding between HHS and the Hospital, the Court is referred to the Declaration of Joseph P. Healy, ...." *See* document 62 of record. However, had the agreement, if it in fact did exist, or the "understanding" mentioned by the Secretary, been made part of the record, the question of its impact upon the present case would have to be explored.

## ORDER

NOW, this 30th day of September, 1992, in accordance with the attached Memorandum, IT IS HEREBY ORDERED that:

(1) The plaintiff's motion for summary judgment is denied.

(2) The defendant's motion for summary judgment is granted.

(3) The Clerk of Court is directed to close this case.